Defendants' Horlocker and Moore's Motion for Summary Judgment

Ralph Eldridge v. City of Warren, P.O. Patrick Moore and P.O. Robert Horlocker
Case No.: 10-12893



# In The Matter Of:

*RALPH ELDRIDGE vs*
*CITY OF WARREN, ET AL*

---

*ROBERT HORLOCKER*
*June 9, 2011*

---

*A & M COURT REPORTING*
*1269 OTTER AVENUE*
*WATERFORD, MI 48328*
*248.681.1867*

Original File HORLOCKE.ASC
Min-U-Script® with Word Index

RALPH ELDRIDGE vs
CITY OF WARREN, ET AL

ROBERT HORLOCKER
June 9, 2011

---

Page 1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RALPH ELDRIDGE,
      Plaintiff,

                              Case No.  10-12893
v.                            Hon. Julian Abele Cook
CITY OF WARREN, a municipal
corporation, OFFICER PATRICK
MOORE and OFFICER ROBERT
HORLOCKER, jointly and severally,
      Defendants.
                              /
          The Deposition of ROBERT
HORLOCKER, taken before Harvey A. Kahn, Certified Court
Reporter and Notary Public, in and for the County of
Oakland, acting in the County of Macomb, State of
Michigan, at 29900 Civic Center Boulevard, Warren,
Michigan on Thursday, June 9, 2011, at about 12:55 p.m.
      APPEARANCES:        ROBIN KYLE, ESQ.
                          615 Griswold
                          Suite 1120
                          Detroit, MI 48226
                          JOHN DOUGHERTY, ESQ.
                          2414 Dorchester North, #101
                          Troy, MI 48084-3760
                          Appearing on behalf of Plaintiff
                          JAMI E. LEACH, ESQ.
                          Garan, Lucow, Miller, P.C.
                          1000 Woodbridge Street
                          Detroit, MI 48207-3192
                          Appearing on behalf of Defendants
      ALSO PRESENT:       PATRICK MOORE

---

Page 2

                    I N D E X

WITNESS                                      PAGE/LINE
ROBERT HORLOCKER

    Direct Examination by Mr. Kyle            4-18
    Cross Examination by Ms. Leach            51-4
    Redirect Examination by Mr. Kyle          55-7
              E X H I B I T S
          - N O N E   M A R K E D -

---

Page 3

1        Detroit, Michigan
2        Thursday, June 9, 2011
3        At About 12:55 P.M.
4              *
5      R O B E R T   H O R L O C K E R,
having first been duly sworn by the Notary
Public to tell the truth, the whole truth,
and nothing but the truth, testified as
follows:
10        MR. KYLE: Let the record
reflect that this is the deposition of
Officer Robert Horlocker, being taken
pursuant to Notice and agreement by counsel
as to time and place, and the transcript is
to be used for all purposes allowable under
The Federal Statutes and Federal Rules of
Civil Procedure.
18        Officer Horlocker, I'm Robin
Kyle, we met this morning.
20        THE WITNESS: Yes, sir
21        MR. KYLE: You sat through
your partner's deposition, and I think
you've been deposed before, is that right?
24        THE WITNESS: Yes, sir
25        MR. KYLE: So you know

---

Page 4

1   what the rules are?
2        THE WITNESS: Yes, sir
3        MR. KYLE: You know you
4   have to give a verbal answer --
5        THE WITNESS: Yes, sir
6        MR. KYLE: -- the court
7   reporter's not supposed to interpret a nod
8   of the head or communications of that sort.
9        THE WITNESS: Yes
10       MR. KYLE: If I ask a
11  question and it's not clear, just tell me
12  and if I can, I'll rephrase it.
13       THE WITNESS: Okay
14       MR. KYLE: So that you
15  understand what you're being asked, and you
16  give an accurate and truthful answer.
17       THE WITNESS: Okay.
18 DIRECT EXAMINATION BY MR. KYLE:
19 Q  You are a currently a police -- is it a
20    police officer, is that your rank?
21 A  Yes, sir.
22 Q  You're with the Warren Police Department?
23 A  Yes.
24 Q  How long have you held that position?
25 A  Thirteen-and-a-half years.

---

RALPH ELDRIDGE vs
CITY OF WARREN, ET AL

ROBERT HORLOCKER
June 9, 2011

**Page 5**

1 Q  Prior to that, where were you employed?
2 A  The Wayne County Sheriff for a couple
3     years, just short of two years, and before
4     that, it was just restaurant work.
5 Q  You graduated from high school in what year?
6 A  1985.
7 Q  When did you go to the police academy?
8 A  When I got hired here, January of '98.
9 Q  So between '85 and '98, did I get that
10    right, you were doing restaurant work?
11 A Yes, sir, and with the Wayne County
12    Sheriff's Department starting in '96.
13 Q What was your title or position with The
14    Wayne County Sheriff's Department?
15 A Detention officer.
16 Q What is a detention officer?
17 A I worked in the jail there.
18 Q Now you know from your training as a police
19    officer and your experience as a police
20    officer, that use of excessive force in
21    effectuating an arrest or an investigation
22    is unconstitutional, is that a fair
23    statement?
24 A Yes, sir.
25 Q How long have you known that?

**Page 6**

1 A  Since at least '98 officially, but . . .
2 Q  Very well. Now, you heard Officer Moore's
3     testimony on the issue of policy with
4     respect to use of tasers?
5 A  Yes, sir.
6 Q  I'm not trying to put words in your mouth
7     or in Officer Moore's mouth, but this is
8     the way I understand it, you can use a
9     taser under The Warren Police Department
10    policy where a suspect or individual does
11    not follow an order given to him or her, is
12    that a fair statement?
13 A Yes, sir.
14 Q It doesn't matter what the reason is for the
15    individual's failure to follow the officer's
16    command, is that a fair statement?
17 A I guess it depends on the scope of the
18    situation, but . . .
19 Q Well, if an individual is sick, and
20    therefore is unable to comply with the
21    officer's command, is it appropriate under
22    the Warren policy as you understand it to
23    use a taser in that situation?
24 A Depends if I know about the illness or not.
25 Q So if you don't know about the illness, and

**Page 7**

1     the individual, as in this case, was
2     apparently indicating I'm okay, I'm fine,
3     and refused to get out of his truck or
4     didn't get out of his truck, the fact that
5     you don't know that the individual is sick
6     and unable to comply does not enter into
7     the equation, is that a fair statement?
8 A  Could you restate that?
9 Q  Yes. I mean, the fact that you don't know
10    about the illness doesn't really affect your
11    decision to use a taser, or does it?
12 A Not knowing that he's ill and refused our
13    verbal commands could lead to a taser
14    situation, yes, sir.
15 Q That's consistent with the Warren policy?
16 A Yes.
17 Q So under the Warren policy, it's okay to
18    taser an individual who is sick and unable
19    to comply simply because the officer hasn't
20    determined or learned that the individual
21    is sick?
22 A In this situation, yes, I can't speak for
23    all situations.
24 Q In this situation, is it your recollection
25    that Mr. Eldridge was sitting in the

**Page 8**

1     vehicle and the keys had been removed from
2     the vehicle before he was tasered?
3 A  No, sir.
4 Q  You think the keys were still in the
5     vehicle when he was tasered?
6 A  Yes, sir.
7 Q  Do you agree with Officer Moore that his
8     foot was on the brake of the vehicle and
9     the vehicle was running?
10 A Yes, the vehicle was in gear, it was
11    running, and his foot was on the brake.
12 Q It's consistent with Warren policy to taser
13    an individual who's sitting in a car with
14    his foot on the brake, the car -- in this
15    case, a truck in drive, and you taser the
16    individual under those circumstances?
17 A No, it's not.
18 Q Oh, okay. Was the tasering in this
19    instance, as far as your understanding,
20    consistent with Warren policy?
21 A Yes, sir.
22 Q So he was tasered after his foot was -- or
23    strike that -- after the vehicle was
24    disabled, after the keys were removed?
25 A After the vehicle was turned off, the

RALPH ELDRIDGE vs
CITY OF WARREN, ET AL

ROBERT HORLOCKER
June 9, 2011

---

**Page 9**

1  engine was not running and the vehicle was
2  in park.
3 Q  So the vehicle was not running when he was
4  tasered?
5 A  Correct.
6 Q  The vehicle, what gear was it in, if you
7  know?
8 A  I believe it was in park.
9 Q  The keys were out of the vehicle?
10 A  No, sir.
11 Q  So you tasered the individual -- or he was
12  tasered by your partner, Officer Moore,
13  before he removed the keys from the vehicle?
14 A  I removed the keys from the vehicle, but it
15  was after the incident.
16 Q  That's consistent with policy?
17 A  Yes, sir.
18 Q  Because the vehicle was in park --
19 A  And not running.
20 Q  -- and not running, and you were not
21  concerned about the vehicle, about him, his
22  foot coming off the brake --
23 A  Correct.
24 Q  -- when he was tasered, and the vehicle
25  just driving off?

---

**Page 10**

1 A  Right.
2 Q  Originally you were sent to this situation
3  because you suspected a driver -- strike
4  that.
5      An individual was operating
6  the vehicle under the influence perhaps?
7 A  Yes.
8 Q  That's the reason indicated in the radio
9  run?
10 A  Yes, sir.
11 Q  It's also in the report that I think you
12  filled out?
13 A  Yes, sir.
14 Q  Which is Exhibit 1?
15 A  Yes.
16 Q  How long did it take you to determine that
17  the individual was not driving under the
18  influence?
19 A  We never did determine that until we found
20  the pump on him when he was on the ground.
21 Q  You didn't smell any alcohol?
22 A  No, just a strong odor of cologne.
23 Q  Was his speech slurred?
24 A  He was just incoherent, he just wasn't
25  answering the questions.

---

**Page 11**

1 Q  Have you in the course of your, I think you
2  said 13 years --
3 A  Yes.
4 Q  -- with the Warren Police Department,
5  you've made numerous arrests, right?
6 A  Yes, sir.
7 Q  Hundreds?
8 A  Yes, sir.
9 Q  You've had numerous experiences with
10  individuals who were intoxicated from
11  alcohol consumption?
12 A  Yes, sir.
13 Q  You can recognize those individuals pretty
14  quickly, is that a fair statement?
15 A  Some of their behaviors, yes.
16 Q  Did Mr. Eldridge, after you got there and
17  talked to him, you've indicated he was kind
18  of incoherent, but did he appear to be
19  intoxicated to you?
20 A  He appeared to be not normal, under the
21  influence of something.
22 Q  Have you had any training, in addition to
23  the training that you heard Officer Moore
24  testify about?
25 A  All my training has come through the

---

**Page 12**

1  department, interdepartmental.
2 Q  Is there any training that you've received
3  on how to distinguish between when an
4  individual is intoxicated from whatever
5  source versus being ill?
6 A  They give you some signs, but some signs do
7  overlap.
8 Q  So at the point in time when you were
9  trying to pull Mr. Eldridge from the
10  vehicle, and let me ask you this, did that
11  occur before or after the first tasering?
12 A  He was, I believe his feet were on the
13  ground, he was kind of -- I had a handcuff
14  on his left wrist, had pulled his arm out
15  of the door, his feet were on the ground,
16  but I believe his arm -- his right hand was
17  still holding the steering wheel, so you
18  can construe that part of his body was
19  still in the truck.
20 Q  When his feet got on the ground, that was
21  the result of your pulling him or
22  attempting to extract him from the vehicle
23  physically?
24 A  I can only assume, I have no idea.
25 Q  The tasering occurs after that?

---

RALPH ELDRIDGE vs
CITY OF WARREN, ET AL

ROBERT HORLOCKER
June 9, 2011

Page 13

1  A  Yes, sir.
2  Q  At that point, you thought he still might be
3      intoxicated?
4  A  At that point, I wasn't worried about it.
5      I was just worried about gaining control of
6      him.
7  Q  Did you have an opinion at that point as to
8      whether or not the individual was
9      intoxicated?
10 A  We felt he was under the influence of
11     something, yes, whether it was alcohol or
12     drugs.
13 Q  Do you have experience dealing with
14     suspects who are under the influence of
15     something other than alcohol?
16 A  Yes, sir.
17 Q  Do you have any experience dealing with
18     individuals who are diabetic?
19 A  This was the first time.
20 Q  You've never received any training about
21     recognizing the symptoms that go with
22     hypoglycemia?
23 A  Not through the department, no.
24 Q  Do you have some personal knowledge about
25     individuals going through hypoglycemia?

Page 14

1  A  Yes, sir.
2  Q  Give me your understanding of what
3      hypoglycemia is?
4  A  Through my experience personally, once
5      my blood sugar gets low, I'm not to the
6      point where I need insulin, but I do need
7      to get food or some sort of sugar in my
8      body.  If I don't get -- I'm not to the
9      point of diabetes, but when my hypoglycemia
10     kicks in, if I don't get that type of food
11     or something in my system, I suffer from
12     headaches, speckles in my vision, stuff
13     like that.
14 Q  Okay.
15 A  I've never been to the point of
16     incoherency.  I've always understood what's
17     going on, and I'm able to take care of it.
18 Q  Are you -- since you brought it up, are you
19     insulin dependent?
20 A  No, sir.
21 Q  Are you diabetic?
22 A  No, sir.
23 Q  What is the condition that you have?
24 A  It's just been diagnosed, way back in
25     junior high, just hypoglycemia.

Page 15

1  Q  Which is a low blood sugar?
2  A  Low blood sugar.
3  Q  But you don't take any medication for that?
4  A  No, sir.
5  Q  You've never had a hypoglycemic episode
6      where you weren't sure what was going on
7      and you couldn't respond to questions and
8      that sort of thing?
9  A  Never.
10 Q  Do you know anyone who has?
11 A  No, sir.
12 Q  Would the experience that you've just
13     identified be the limit of your experience
14     prior to June 18, 2009 of individuals
15     suffering from some type of hypoglycemic
16     episode?
17 A  Yes, sir.
18 Q  And again, there's been no training about
19     how to recognize an individual who is
20     suffering from a hypoglycemic episode?
21 A  No, not through the department.
22 Q  Is there any training on what to do once
23     you've determined that you've encountered
24     an individual who has hypoglycemia?
25 A  After this incident, they made some

Page 16

1      suggestions.
2  Q  There weren't any prior to this incident?
3  A  Nothing formal, no.
4          MR. KYLE: Counsel, I'm
5      anticipating a subsequent remedial measure
6      objection.
7  BY MR. KYLE:
8  Q  But I'm going to ask you, just for purposes
9      of discovery, what did they tell you?
10         MS. LEACH: Objection,
11     subsequent remedial measure.  You can
12     answer the question.
13 BY MR. KYLE:
14 Q  Go ahead, officer?
15 A  They just gave us some typical signs you may
16     encounter with somebody who might be
17     suffering a diabetic shock incident or a
18     diabetic who might not be up to par, up to
19     their proper blood sugar level.
20 Q  They used the video of this particular
21     incident, that's the subject of this
22     lawsuit as kind of, for lack of a better
23     term, training video for that?
24 A  They actually used it to show that you're
25     not always dealing with what you think.

RALPH ELDRIDGE vs                                            ROBERT HORLOCKER
CITY OF WARREN, ET AL                                                June 9, 2011

Page 17

1  Q  Was there any training with relation to
2     that video with respect to how to respond
3     to an individual who's in a vehicle or in
4     another situation, where they're in a
5     hypoglycemic episode?
6  A  I wouldn't say it that way.
7  Q  Well, how would you say it?
8  A  They just gave some signs of diabetes, what
9     somebody might be going through, it doesn't
10    matter if they're in their house or in a
11    car, and every situation's different, I
12    mean, it depends on their blood sugar level
13    as to how they're going to respond.
14 Q  Was there any training in relation to this
15    number or this millions of numbers of
16    diabetics in this country?
17 A  They might have thrown statistics out
18    there, they threw statistics out there
19    about autism.  They might have thrown
20    numbers at us, I don't recall those numbers.
21 Q  Now, the policy as you understand it, just
22    assume hypothetically that you've made a
23    determination that the individual is
24    possibly suffering from a hypoglycemic
25    episode, let's say you see a necklace or a

Page 18

1     bracelet or something that indicates that,
2     and you tell the individual they have to
3     get out of the car and they don't comply,
4     is it the Warren policy the taser would
5     still be an appropriate method to get the
6     individual to comply with the police orders?
7  A  I believe it depends on how the situation
8     goes, but at that point, we're still
9     responsible for his health now, and fire
10    can't necessarily treat him in that
11    position, so I do believe we still have to
12    gain control of him, and put him in a
13    situation where he can be treated.
14 Q  So the training that you've received,
15    either before or subsequent to this
16    incident, indicates to you that a taser is
17    still an appropriate method to get a
18    diabetic in a hypoglycemic situation out of
19    a vehicle, a taser would be an appropriate
20    use of force?
21 A  Yes, because until our fire responds and
22    tells us for sure, I don't know, without
23    identifiers, I don't know what that person
24    is suffering.
25 Q  Now, after the first deployment of the

Page 19

1     taser, what's your recollection of what
2     happened?
3  A  I had the handcuff on him and both my hands
4     on his left wrist.  I believe, I don't know
5     if I told Officer Moore to taser him or if
6     he just did.  I know it was deployed
7     because I could hear the darts -- the
8     probes shoot out, they make an ejection
9     sound, but you could hear, it was a, it's
10    like a staggered crackling sound, you know
11    it didn't take effect.  And based on his
12    struggling, the amount of struggling he's
13    still showing us, it did not take effect.
14 Q  Backing up for a minute, do you recall
15    anyone asking him for his driver's license?
16 A  I thought I heard it, but I don't recall
17    now.
18 Q  Is that a department policy in this kind of
19    situation, the first thing you would do is
20    ask the individual for a driver's license
21    and registration?
22 A  Most times we do, but like I said, it
23    depends on the situation.
24 Q  What about this situation excepted it from
25    the most of the times?

Page 20

1  A  I'm sorry?
2  Q  What about this situation, assuming you
3     didn't -- no one asked him for his driver's
4     license when you first encountered him, why
5     would that be, why would you not do what
6     you usually do, which is to ask for a
7     driver's license?
8  A  When we approach the vehicle, we can see,
9     obviously, his foot is on the brake, we go
10    up to the vehicle, we can see it's in gear,
11    our main concern is to stop that vehicle,
12    number one, from moving if something does
13    occur, and sometimes it just doesn't come
14    out, where's your license.
15 Q  So after -- we were talking about what
16    happened after the first deployment of the
17    taser, and I think you said you had a
18    handcuff on Mr. Eldridge's left wrist?
19 A  Yes, sir.
20 Q  Then what happened after that?
21 A  I believe I heard the trigger being pulled
22    again because there was a pause after the
23    first five seconds.  We know it didn't take
24    effect because he was still standing and
25    still pulling away from us and struggling,

Page 21

1  and so I could hear the trigger being
2  pulled again because you could hear that
3  same crackling again.
4  Q  Then what happened next?
5  A  That still didn't take effect.  At that
6     point, we were able to get him at least up
7     against his truck, and then we were able to
8     get him to the ground, we wrestled him to
9     the ground.
10 Q  Do you recall what Mr. Eldridge was saying?
11 A  I -- I don't recall for sure.
12 Q  Okay.
13 A  I don't recall exactly what he was saying.
14 Q  You got him on the ground?
15 A  Yes, sir.
16 Q  Did you see, at any point while he was on
17    the -- while Mr. Eldridge was on the
18    ground, did you see Officer Moore place his
19    knee on the back of Mr. Eldridge's neck?
20 A  No, sir.
21 Q  Do you believe that did not happen?
22 A  I believe it did not happen.
23 Q  How sure are you that it did not happen?
24 A  I'm pretty sure because I was looking down,
25    trying to gain control of his right arm,

Page 22

1  and I could see all the way up to his
2  shoulder, and I believe that's where the
3  knee was connected to, was at that shoulder
4  blade.
5  Q  You would agree that placing the knee on
6     the back of Mr. Eldridge's neck while he
7     was on the ground like that, would have a
8     high probability of resulting in an injury?
9  A  It may, I mean, everybody's different,
10    everybody reacts to different physical
11    force different ways.  So I can't speak for
12    his body make-up.
13 Q  How big is Officer Patrick Moore?
14 A  About 5-11, 240 pounds maybe.
15 Q  He is strong?
16 A  I would imagine, I've never had to fight
17    him.
18 Q  You ever hand wrestle him?
19 A  No.
20 Q  No, okay.  Would that be excessive, in your
21    opinion, under these circumstances for
22    Officer Moore to place his knee on the back
23    of Mr. Eldridge's neck?
24 A  I can't speak for him.
25 Q  Well, let me ask you this, are you his

Page 23

1  superior officer?
2  A  No, we're equal.
3  Q  You're equal, okay.
4  A  Yes, sir.
5  Q  One of you is not in charge of the other?
6  A  No.
7  Q  One of you guys says let's turn right, the
8     other one says let's go left --
9  A  I guess it just depends on who's driving.
10    Depends on who's driving, right?
11 A  Yes.
12 Q  But as you saw the situation unfold, and
13    we're at the point where Mr. Eldridge is on
14    the ground, and he's face down on the
15    pavement, is that right?
16 A  I believe his head was turned to one side
17    or the other.
18 Q  But his stomach is on the ground?
19 A  Yes, sir.
20 Q  You and Officer Moore are on his back?
21 A  Yes, we're over him, yes.
22 Q  How much do you weigh?
23 A  About 240.
24 Q  Under those circumstances, this is after he's
25    tasered, he's on the ground, there's a

Page 24

1  handcuff on the left arm -- or wrist, and
2  his wrist is behind his back at that point?
3  A  Yes.
4  Q  Assuming that -- or strike that.
5         Under those circumstances,
6     would it be an excessive use of force to --
7     for Officer Moore to place his knee on the
8     back of Mr. Eldridge's neck?
9  A  I can't speculate what he's thinking.  We
10    only have control of one arm.  His other
11    arm is under his body.  I don't anything
12    about Mr. Eldridge, I don't know what he's
13    doing with that other hand, so I have no
14    idea.
15 Q  Well, you can see his other hand, couldn't
16    you?
17 A  Not at first, it was tucked under the right
18    side of his chest.  I was trying to gain
19    control of that hand.
20 Q  But he was pulling that hand away from you,
21    is that what you're saying?
22 A  He was holding it under his body and
23    refusing to bring it back.
24 Q  You had seen it while he was in the
25    vehicle, his right hand?

Min-U-Script®

RALPH ELDRIDGE vs
CITY OF WARREN, ET AL

ROBERT HORLOCKER
June 9, 2011

**Page 25**

1 A  Yes, initially, yes.
2 Q  Let me ask you this, would it be excessive
3    force for Officer Moore to, as was
4    suggested during his deposition, to bounce
5    his knee upon the back of Mr. Eldridge's
6    neck under the circumstances that we're
7    talking about, would that be an excessive
8    use of force?
9 A  I suppose it might, depending, yes, in this
10   situation, it might.
11 Q  Now, you understood from -- strike that.
12          Did you review the video of
13   this situation before your deposition today?
14 A  Yes, sir.
15 Q  When did you do that?
16 A  9:30, quarter to ten.
17 Q  Had you seen it since it was recorded back
18   in June, on June 18, 2009?
19 A  Just during the training course.
20 Q  How many times total have you seen the
21   entire video?
22 A  Two.
23 Q  That was during the training?
24 A  Yes, sir.
25 Q  And today?

**Page 26**

1 A  Yes, sir.
2 Q  When did that training take place?
3 A  Well, this happened in June of '09, our
4    training starts in January, so it's
5    sometime between January and May of 2010, I
6    would believe.
7 Q  This would be -- wait a minute, I'm sorry,
8    I started talking before you finished.
9 A  It was sometime in our winter season of
10   2010, I believe, I don't think it was this
11   year, I don't recall.  It was either early
12   2010 or early this year.
13 Q  Was there an instructor, for lack of a
14   better term, during that training session?
15 A  Somebody showed the video and spoke briefly
16   about the diabetes situation, but I don't
17   recall who it was.
18 Q  Was it an officer?
19 A  It was a corporal.
20 Q  Someone in the Warren Police Department?
21 A  Somebody in the training department --
22 Q  In the training department?
23 A  Yes.
24 Q  Now, the individuals in the training
25   department, are they limited to that, is

**Page 27**

1    that basically what they do while they're
2    on that detail or do they patrol?
3 A  That's what they do during the day, but a
4    similar of them are PERT team, but that's
5    their main duties here as a corporal.
6 Q  You said Perk team?
7 A  PERT, I think our SWAT team, they do other
8    things besides that if they choose, but
9    that's their main duty here, is the
10   training department.
11 Q  Is that P-E-R-T?
12 A  Yes.
13 Q  What does that stand for?
14 A  I believe it's Police Emergency Response
15   Team.
16 Q  Now, so we're at a point where Mr. Eldridge
17   is on the ground, you've got a handcuff on
18   one, the left wrist, and your testimony is
19   the right wrist is kind of under his body,
20   is that right?
21 A  Yes.
22 Q  At that point, Officer Moore is -- exactly
23   where is Officer Moore?
24 A  Well, if Mr. Eldridge's head would be here,
25   and his legs are going this way, Officer

**Page 28**

1    Moore's left leg is kind out this way and
2    his knee and right leg is across the
3    shoulder blades and upper back here.  I
4    believe I might have been like over his
5    buttocks area and over like his right leg,
6    trying to get that right arm behind him
7    while I'm holding his left arm.
8 Q  Are you, just so I understand you
9    correctly, Officer Moore has his knee on
10   around the shoulder blades of Mr. Eldridge?
11 A  From my angle, it appeared that Officer
12   Moore's right kneecap was into the right
13   shoulder blade of Mr. Eldridge, and going
14   back across that way towards Officer
15   Moore's body, which was to the left of
16   Eldridge.
17 Q  You are near Mr. Eldridge's buttocks.  Do
18   you have a knee or foot on him at that
19   point?
20 A  I've got one knee across like his upper
21   buttocks or small of the back, and I'm
22   trying to get that right arm back -- I'm
23   holding his left arm still, and trying to
24   wrestle his right arm behind him.
25 Q  Both of you were using your knees on Mr.

RALPH ELDRIDGE vs
CITY OF WARREN, ET AL

ROBERT HORLOCKER
June 9, 2011

Page 29

1  Eldridge's back?
2  A  I believe we each had a knee on his back,
3     yes.
4  Q  Is that a specific technique that's trained
5     in the department, that is, the use of a
6     knee on the back of an individual who's on
7     the ground?
8  A  That's a method, I mean, he's on his
9     stomach, we're trying to get control of his
10    back, and to keep his body from moving, we
11    place a knee over it.
12 Q  Do you recall Mr. Eldridge yelling while
13    this was going on, that is, while he's on
14    the ground and both of you are on his back?
15 A  I don't recall.
16 Q  How much do you weigh?
17 A  About 240.
18 Q  So what happens next?
19 A  Well, we're finally able to get his right
20    hand back there, I believe because his
21    shoulders and arms were so broad, in fact,
22    that we used a second pair of handcuffs as
23    to not bring his arms too far back.
24 Q  Okay.
25 A  We get the second pair of handcuffs on him,

Page 30

1     and at that point, we stand him up.
2  Q  Now, did you put the cuffs on both wrists,
3     or --
4  A  I believe I did.
5  Q  Then did you connect an extra pair of cuffs
6     between those two cuffs, between the cuffs
7     on the right and the cuffs on the left?
8  A  There was just two pair total.  Instead of
9     using one pair, we grabbed -- I grabbed --
10    I had Officer Moore give me his pair --
11 Q  I got you.
12 A  -- we put it on his right wrist, connected
13    the two sets of handcuffs together.
14 Q  Did Mr. Eldridge ever complain that the
15    cuffs were on too tight?
16 A  I didn't hear him say anything about that.
17 Q  Did you ever loosen them up?
18 A  Eventually, before the fire department got
19    there, we took them right off.  I didn't do
20    anything with them so I don't recall.
21 Q  We're coming to that.
22 A  Okay.
23 Q  So you've got the cuffs on him?
24 A  Yes.
25 Q  What happens after you get the cuffs on Mr.

Page 31

1     Eldridge?
2  A  At that point, we stand him up.  I can see
3     the imprint of a wallet in his back pocket,
4     so I pull that out looking for
5     identification.  At the same time I'm doing
6     that, I believe this device fall out from
7     under his shirt, where his shirt was tucked
8     in.  It was like a black leather pouch, and
9     there was a wire connected to it and
10    exposed a little blue device within that
11    pouch at that point.
12 Q  Now when you saw that, what was your --
13    what went through your head?
14 A  I just looked at the pump and right away I
15    thought maybe diabetes or some type of
16    illness.
17 Q  Did you recognize it as a pump?
18 A  Yes.
19 Q  You'd seen one of those before?
20 A  Not like that, no.
21 Q  Something similar to that?
22 A  I just know, I've heard of pumps being
23    hooked up to people for diabetes to inject
24    insulin when it's needed.
25 Q  You've heard of pumps being hooked up to

Page 32

1     people for other forms of treatment?
2  A  Yes.
3  Q  So when you saw it, correct me if I'm
4     wrong, you knew that unless this guy was a
5     faker, walking around with a pump for no
6     reason, he had some type of medical
7     condition?
8  A  At that point, yes.
9  Q  The first thought you had was he was
10    probably diabetic?
11 A  That was our first thought, yes.
12 Q  That was your first thought?
13 A  Yes.
14 Q  Excuse me.  So the device that you saw, you
15    were holding this, is that correct?
16 A  Yeah, when it fell out from under his
17    shirt, I was holding it in my hand, but I
18    could see wires going to his shirt, so I
19    didn't pull it, I was just holding it.
20 Q  So what did you do with the device after
21    that?
22 A  I don't know if I tucked it in his pocket,
23    or I don't know what I did with it at that
24    point.  I don't know if I tucked in his
25    pocket or put like back in his belt, I

RALPH ELDRIDGE vs
CITY OF WARREN, ET AL

ROBERT HORLOCKER
June 9, 2011

Page 33

1       don't recall what I did with it at that
2       point.
3 Q  He was still handcuffed at that point, that
4       is, Mr. Eldridge was --
5 A  Yes, sir.
6 Q  -- still handcuffed?
7 A  Yes.
8 Q  Did you say anything to anyone about the
9       device?
10 A  I just looked at Officer Moore initially,
11       and said what is this, and then, you know.
12 Q  Did Officer Moore respond, to the best of
13       your recollection?
14 A  I believe he looked at it also. We might
15       have talked about what it could be, and we
16       came to the conclusion probably diabetes,
17       some type of medical pump.
18 Q  Do you recall what he said?
19 A  I just believe said should we call fire or
20       do we need fire or something about the fire
21       department.
22 Q  Did he say anything else that recall him
23       saying about the pump?
24 A  No, sir.
25 Q  So what happened next?

Page 34

1 A  I believe Officer Moore called for dispatch
2       to have the fire department and Universal
3       Ambulance respond to our location.
4 Q  After he called EMS, what happened?
5 A  They responded and checked his blood level.
6 Q  What happened with respect to Mr. Eldridge
7       once you determined that it more likely
8       than not, he had a medical condition,
9       specifically diabetes, and Officer Moore
10       called EMS, was Mr. Eldridge still on the
11       ground, where was he?
12 A  No, he was standing up when we located the
13       pump, and at that point, we escorted him
14       over to the front of our scout car, there's
15       a black push bumper there, we told him to
16       have a seat there.
17 Q  Was he still handcuffed at that point?
18 A  Yes.
19 Q  So he was handcuffed after you determined
20       that he was sick?
21 A  After we saw the pump, I can't determine if
22       he's sick or not.
23 Q  You saw the pump, did you ask Mr. Eldridge
24       if he had a medical condition?
25 A  At that point, yes, we did.

Page 35

1 Q  Was that the first point at which you
2       considered that he might be sick, as
3       opposed to being drunk?
4 A  Yes.
5 Q  Do you recall what he said?
6 A  Well, I think we might -- I might have
7       asked do you have a medical condition, I
8       didn't ask specifically what, and I think
9       he said yes or shook his head, but he did
10       respond in a positive way.
11 Q  What happened after that?
12 A  After that, like I said, he was escorted to
13       the front of the scout car.
14 Q  Did you ask him about his medical condition
15       any further?
16 A  I don't recall.
17 Q  Did you, after that point, did you loosen
18       the cuffs at some point?
19 A  I didn't touch the cuffs anymore. I don't
20       know when they were loosened or . . .
21 Q  So he remained in cuffs until the ambulance
22       arrived?
23 A  I believe they were removed before that,
24       but he was still in cuffs when he was
25       sitting on the front of our car.

Page 36

1 Q  Were you -- once you called for EMS and you
2       talked to Mr. Eldridge, whatever you said
3       to him about his condition, were you fairly
4       convinced at that point that there was a
5       medical situation going on with Mr.
6       Eldridge that explained why he did not
7       comply when he was asked to get out of the
8       truck or ordered to get out of the truck?
9 A  Well, at that point we felt it was
10       necessary to have medical come and
11       determine that for us.
12 Q  Were you -- strike that.
13           What do you know about
14       treating in an emergency situation,
15       treating a hypoglycemic episode?
16 A  We've always -- I've always heard the myth
17       orange juice or some type of glucose.
18 Q  Individuals, to your experience and
19       knowledge, who are suffering from a
20       diabetic hypoglycemic episode are not
21       violent?
22 A  I wouldn't say that. I have no idea.
23 Q  You haven't had, as of June 18th, 2009, you
24       hadn't had adequate training or experience
25       to know?

**A & M COURT REPORTING**
248.681.1867

RALPH ELDRIDGE vs
CITY OF WARREN, ET AL

ROBERT HORLOCKER
June 9, 2011

Page 37

1  A  I've never dealt with one person going
2     through that episode, no.
3  Q  So that covers your personal experience.
4     What about your training, would you have
5     had adequate training at that time to know
6     if an individual was suffering from a
7     hypoglycemic episode, really needs some
8     sugar or orange juice?
9  A  No, nothing formal, like I said, we're
10     given first aid and CPR every year, and
11     that might have been, you know, mentioned,
12     but never covered.
13  Q  So as far as your training goes, you
14     wouldn't know whether or not such an
15     individual would be prone to violence?
16  A  I have no idea, correct.
17  Q  Since this incident, have you received
18     training, one way or the other, indicating
19     how you would address an individual that
20     you come upon who's seated in a vehicle, as
21     you've described, and as I think your
22     partner described during his deposition,
23     how would you handle that situation
24     differently in light of the training you
25     have received subsequent to June 18th, 2009?

Page 38

1  A  Seeing as how he had no indication to alert
2     us to his condition, I might not have done
3     anything different.
4  Q  But once you realized that he had a
5     hypoglycemic episode, he was in the middle
6     of hypoglycemic episode at the point in
7     time when you discovered the pump when he
8     was on the ground, what would you have done
9     differently from that point, if anything?
10  A  From that point, I don't know, 'cause
11     there's nothing saying a diabetic can't be
12     drunk or violent, so, I don't know anything
13     about this gentleman.
14  Q  You didn't believe he was drunk though at
15     that point, right, after you found --
16  A  At that point, I didn't believe so.
17  Q  Right, because, I mean, you were in very
18     close contact with him, correct?
19  A  Correct, yes.
20  Q  You had a chance to observe his demeanor,
21     his eyes, you couldn't detect any odor of
22     alcohol coming out of his pores or
23     otherwise, is that true?
24  A  We just smelled cologne on him.
25  Q  Excuse me.  Do you recall, after

Page 39

1     discovering the device, either you saying
2     or Officer Moore saying we're fucked?
3  A  Nobody ever said that.
4  Q  How was the audio when you reviewed the
5     tape?  I heard Officer Moore say the audio
6     wasn't that good.  Did you have an
7     opportunity to review the video with
8     adequate audio?
9  A  On the computer we saw it on, the volume
10     only went so high, so it was almost
11     muffled, but . . .
12  Q  So it's a fair statement that you don't
13     really know what was said independent of
14     your own memory?
15  A  Of my own memory, nothing was said like
16     that.
17  Q  But you're not going to argue with what the
18     audio actually is on the CD?
19  A  I would not argue with the audio that's
20     present.
21  Q  Okay, very good.  Now, were you shown
22     what's called a duces tecum, I'm sure you
23     know what that is, a request that you bring
24     certain documents to this deposition, was
25     that shown to you?  Don't feel bad if it

Page 40

1     wasn't, lawyers never show the witness, I
2     don't know why, but they don't.
3  A  I was not shown it either.
4  Q  Do you have anything, any documents that you
5     generated as a result of this incident on
6     June 18, 2009 pertaining to Mr. Eldridge,
7     any document that you generated that we
8     haven't looked at today?
9  A  I don't believe so.
10  Q  The only thing you would have generated is
11     Exhibit 1, which is in front of you?
12  A  Yes, sir.
13  Q  Did you make any notes during your training
14     session?
15  A  During my training session?
16  Q  Yes.
17  A  No, sir.
18  Q  What about with respect to tasering, did
19     you make any notes about anything you were
20     trained respecting tasering?
21  A  No, sir, it's all just hands on.
22  Q  Going back to the training and using this
23     video, I want, and correct me if I'm
24     wrong, I'm not trying to put words in your
25     mouth, it was really a video on, as I think

Page 41

1  you said, things may not always be as you
2  think, and if an individual suffering from
3  a diabetic situation, an ambulance needs to
4  be called or sugar administered, I think
5  you guys did in this case?
6 A  No, I think they pretty much left it as you
7  don't always have what you think.
8 Q  There wasn't any real instruction on what
9  to do in that situation?
10 A  No.
11 Q  Now one of the things we asked for and it's
12  your lawyer's fault that we don't have it,
13  that's just a joke I'm not being serious.
14  We asked for copies of any and all
15  statements taken by you in connection with
16  the June 18th incident.
17  Did you take any written
18  statements from anyone at the scene?
19 A  I spoke to Mrs. Tramble, but I don't know
20  if I handed her the statement or if I had
21  Officer Kohlruss do it.  I believe I had
22  her fill it out, and it should be somewhere
23  with the report, but I don't recall that.
24 Q  Did she actually fill out a statement?
25 A  I spoke to her verbally, but I don't know

Page 42

1  if I gave her something to fill out or if
2  Officer Kohlruss or if we just wrote her
3  information down here so somebody could
4  speak with her, that's why we have a phone
5  number.
6 Q  Did she sign the statement that --
7 A  I don't even know if she filled one out, so
8  . . .
9 Q  Okay, I see, because I didn't see one, but
10  I'm looking through the --
11 A  If she filled one out, it would have been
12  with the packet you got.
13  MS. LEACH: Mr. Kyle, I'm
14  looking too, just to make sure, but I don't
15  recall there being a written statement.
16  MR. KYLE: I don't either.
17  MS. LEACH: If there was,
18  I would have attached the initial
19  disclosures.
20  THE WITNESS: I might have
21  just spoken to her and wrote down her
22  formation to include with this as a witness.
23 BY MR. KYLE:
24 Q  The information that you got from this
25  individual, you first became aware of it

Page 43

1  after you had already encountered the pump,
2  and this was after the ambulance had
3  arrived and attended to Mr. Eldridge that
4  this statement was taken?
5 A  Yes, after I spoke to her, yes, it was after
6  everything.
7 Q  So, obviously, that wouldn't have affected
8  anything that you or your partner did prior
9  to when the statement was given?
10 A  No, sir.
11 Q  How do you spell which name?
12 A  Kohlruss?
13 Q  Yes.
14 A  I believe it was K-o-h-l-r-u-s-s, he came
15  to the scene, I believe even after the fire
16  department or right around the same time as
17  them.
18  MR. DOUGHERTY: K-o-h?
19  THE WITNESS:
20  K-o-h-l-r-u-s-s.
21 BY MR. KYLE:
22 Q  Now, there's been some testimony that the
23  Warren Police Department first issued
24  tasers in about 2006?
25 A  Yes, sir.

Page 44

1 Q  Is that consistent with what you recall?
2 A  Yes, sir.
3 Q  Did you get one right away?
4 A  Yeah, I mean, within the first few weeks,
5  they pretty much had them distributed, you
6  know, within a month, I believe.
7 Q  Do all officers carry them?
8 A  Everyone on the street carries one, yes.
9 Q  Are you aware of any use of a taser by any
10  Warren police officer that was later
11  determined to be inappropriate?
12 A  I have no knowledge, no.
13 Q  Do you know anything about there was a news
14  report of a taser use by this department on
15  a individual who was already in custody and
16  the video depicts him being tasered and
17  then officers laughing, do you know
18  anything about that?
19 A  No, sir.
20 Q  Do you know of any review of that use of
21  taser?
22 A  It doesn't involve me, I have no idea.
23 Q  You didn't see any memorandums or any
24  directives from the department indicating
25  that that use of a taser would be in

RALPH ELDRIDGE vs
CITY OF WARREN, ET AL

ROBERT HORLOCKER
June 9, 2011

Page 45

1 appropriate?
2 A No, I don't recall.
3 Q When is it inappropriate for an officer to
4 use a taser as defined by the policy as you
5 understand it?
6 A It's inappropriate as a punitive tool.
7 Q That's basically the limit on taser use by
8 officers, is you can't use it as a means of
9 inflicting punishment?
10 A Correct.
11 Q Now there was, you would agree with me or
12 maybe you wouldn't, maybe because of the
13 audio you're unable to say one way or the
14 other, but when I reviewed the video, there
15 are times where the sound completely cut
16 off. It appears as if someone threw a
17 switch or something and muted the recording
18 of the audio.
19 A Okay.
20 Q Do you know how that happened, or first of
21 all, do you know that that did happen or do
22 you know one way or the other?
23 A Just watching the video, I don't know, I
24 mean, that system was faulty, that's why
25 they got rid of it. From personal

Page 46

1 experiences, I know where the toggle is
2 located, if you turn your body a certain
3 way, your vest turns that switch off,
4 that's why that system was ineffective.
5 Q You didn't disable the audio at any point
6 during --
7 A I wasn't wearing a microphone at all that
8 day.
9 Q I see. So if someone turned it off, it was
10 not you?
11 A Correct, in a two-man, they only assign one
12 remote microphone to any vehicle.
13 Q Were you driving that day or was Officer
14 Moore?
15 A Officer Moore was driving.
16 Q Once Mr. Eldridge was in cuffs and seated
17 on the front of the scout car, would you
18 agree that you guys had control of the
19 situation?
20 A Yes, sir.
21 Q He wasn't a threat at that point?
22 A I didn't feel so, no.
23 Q Was there any reason to leave him in
24 handcuffs at that point?
25 A Until our fire department could verify it

Page 47

1 was a medical emergency, yeah, we just
2 struggled with him. If it turns out it's
3 not, why go through that again?
4 Q Did you see what the emergency medical
5 response team did to Mr. Eldridge to
6 address -- or strike that.
7 Just what they did to him,
8 did you see that?
9 A Just from the video, I believe they might
10 have checked his blood through his hand or
11 finger and checked that, and determined a
12 level and gave him I believe it was just a
13 tube of glucose gel.
14 Q Where were his hands --strike that.
15 Was he still in handcuffs
16 when that happened?
17 A I believe he was not.
18 Q Did you receive any instruction from the
19 medical response team?
20 A I don't recall.
21 Q Did you have any discussion with them about
22 Mr. Eldridge that you can recall?
23 A We might have just said we found a pump, he
24 might be diabetic, but I don't recall any
25 conversation with them.

Page 48

1 Q Did someone on the emergency medical
2 response team tell you to remove the
3 handcuffs?
4 A I don't recall who said.
5 Q You don't know whose decision it was or
6 idea it was to take the cuffs off?
7 A No, 'cause I didn't take them off.
8 Q Assuming someone else hadn't removed the
9 cuffs, when would you have removed them?
10 A I don't recall anything about removing the
11 handcuffs. Maybe I did do it, I just don't
12 recall that part of it.
13 Q When, consistent with policy, would it have
14 been appropriate to remove the handcuffs?
15 A If the fire department requested it, or if
16 it is determined it's just a medical
17 problem, I mean . . .
18 Q Are you trained to inquire of an individual
19 under these circumstances as to whether or
20 not they have a medical condition before
21 force is used to remove the individual from
22 the vehicle?
23 A Could you rephrase that?
24 Q Yes. Is it your training that you've
25 received from the City of Warren, that

RALPH ELDRIDGE vs
CITY OF WARREN, ET AL

ROBERT HORLOCKER
June 9, 2011

Page 49

1   under these circumstances, you would make
2   an inquiry of the individual once you've
3   taken the keys from them and, you know, the
4   person can't drive off and hurt himself or
5   somebody, are you trained to inquire as to
6   whether or not there's a medical
7   explanation for the individual's
8   non-compliance?
9 A  Generally people offer that information or
10  there's some type of sign.  Once we get
11  that sign, I mean, we go from there.
12 Q What signs are you looking for?
13 A  Bracelet, necklace, a badge, the pump on
14  the outside of the body, any type of
15  medical.  We've seen pouches with needles
16  in them and people say they're diabetic,
17  anything to indicate any medical necessity.
18 Q Now were you interviewed about this
19  incident by anyone in the Warren Police
20  Department?
21 A  Not officially.  My sergeant might have
22  asked what happened, we told him what
23  happened, that's it.
24 Q Have you seen this document that is a inter-
25  department communication, Warren Police,

Page 50

1   6-18-09, to Commissioner William Dwyer, it
2   says through chain, from Sergeant Mark
3   Javery, Number 511, subject: taser
4   deployment, 09-35770?
5 A  I have not seen that, no.
6 Q You have not seen that.  When you said your
7   sergeant might have asked you what
8   happened, is that Mark Javery?
9 A  I believe he was in the station just
10  checking on the paperwork.  I believe a
11  different sergeant came to the scene.
12  Anytime there's a taser deployment, we call
13  for a supervisor.
14 Q You're referring to whomever came to the
15  scene on that date?
16 A  Yes, sir.
17 Q You don't recall that individual's name?
18 A  I believe it was Sergeant Colegio, but . . .
19      MR. DOUGHERTY:  Ask him to
20  spell that name again.
21 BY MR. KYLE:
22 Q Would you please spell that name again,
23  please?
24 A  Yeah, C-o-l-e-g-i-o.
25      MR. KYLE:  That's all I

Page 51

1   have.  Thank you.
2       MS. LEACH: I'm going to
3   have some questions.
4 CROSS EXAMINATION BY MS. LEACH:
5 Q Officer Horlocker, just a few questions for
6   you.  There were some questions regarding
7   taser use and verbal non-compliance and
8   your procedures, you remember all those
9   questions?
10 A Yes.
11 Q In this particular situation, Mr. Eldridge
12  wasn't tasered only for verbal
13  non-compliance, was he?
14 A  No.
15 Q You were physically trying to remove him
16  from the vehicle?
17 A  Yes.
18 Q He was resisting those attempts?
19 A  Yes, he was.
20 Q For a period of time?
21 A  Yes.
22 Q Do you recall how tall Mr. Eldridge was?
23 A  I believe he was at least my height, I
24  believe he's probably at least six-two.
25 Q Any idea about how much he weighed or

Page 52

1   weighed at the time?
2 A  Over 200 pounds.
3 Q Did he feel strong to you?
4 A  Yes, he did.
5 Q You've struggled with people?
6 A  Yes.
7 Q When you were trying to get him cuffed and
8   you described how you had one knee on his
9   lower back, buttocks area, did you have
10  your full weight on him?
11 A No, because I'd say some of my weight was
12  probably on my other leg, I needed to
13  balance myself.
14 Q Where was your other leg or knee?
15 A On the ground next to him.
16      MS. LEACH: Let's go off the
17  record for just a second.
18      (Off the record)
19 BY MS. LEACH:
20 Q Officer Horlocker, we took a break and
21  tried to listen to -- and did listen to the
22  DVD from the patrol car that had some audio
23  on it.  At the point where you were
24  questioned on direct examination about a
25  comment, something about you were going to

Min-U-Script®

RALPH ELDRIDGE vs
CITY OF WARREN, ET AL

ROBERT HORLOCKER
June 9, 2011

Page 53

1    be fucked or something like that, and we
2    checked that time stamp that was provided
3    to us by plaintiff's counsel, is that
4    correct?
5  A  Yes.
6  Q  You are saying something on the video, is
7    that correct?
8  A  I'm saying something, yes.
9  Q  It directly follows Officer Moore asking if
10   he should call for fire, correct?
11 A  Yes.
12 Q  Were you able to make out what it was you
13   were saying?
14 A  I cannot make it out.
15 Q  Do you have any recollection of saying
16   anything along the lines of we're going to
17   be fucked or we're going to get fucked?
18 A  No, not at all.
19 Q  No question in your mind?
20 A  No question in my mind in that situation.
21 Q  Did you have any reason to say something
22   like that?
23 A  No.
24 Q  Just one final thing.  I know that there
25   were some questions about the taser

Page 54

1    procedure and policies of the City of
2    Warren Police Department.  Are you aware
3    that there's a written procedure regarding
4    taser use?
5  A  Yes.
6  Q  There was one in effect at the time of this
7    incident?
8  A  Yes.
9  Q  Did you memorize that word-for-word?
10 A  No, I did not.
11 Q  Let me just read to you from the second
12   page where it says, The taser may be
13   deployed in situations where the resistance
14   offered by the subject exposes the officer,
15   the subject, or public to unnecessary
16   danger, or when lesser means of control
17   have been ineffective, or are likely to be
18   ineffective.
19        Are you familiar with that
20   language?
21 A  Yes, I am.
22 Q  In this situation, did you believe that
23   lesser means if control had been
24   ineffective?
25 A  Yes.

Page 55

1  Q  Did you have any reason to think that
2    continuing to pull on his arm was going to
3    effective?
4  A  No, not at that point.
5        MS. LEACH: I have no more
6    questions.
7  REDIRECT EXAMINATION BY MR. KYLE:
8  Q  Officer Horlocker, as I understand your
9    testimony on direct from your attorney,
10   your recollection is that Mr. Eldridge was
11   not tasered until you guys, that is, you
12   and Officer Moore physically were
13   unsuccessful in pulling him out of the car,
14   is that right?
15 A  Yes.
16 Q  So he wasn't tasered until there was a
17   physical confrontation between Mr. Eldridge
18   and yourself and your partner?
19 A  Yes.
20 Q  Now, the second time the taser was
21   deployed, then according to your testimony,
22   would also have been after physical means
23   were unsuccessful in removing him from the
24   vehicle?
25 A  The second time was during the same

Page 56

1    struggle, so I --
2  Q  Okay.
3  A  Obviously, the first one lasted five
4    seconds, might be another four or five
5    seconds to realize nothing's happening, and
6    then . . .
7  Q  Was that a discretionary decision on your
8    part or would the policy have allowed you
9    to taser before you attempted force as you
10   understand the policy?
11 A  Discretionary at what point?
12 Q  At the point in time where you -- where the
13   taser was -- I understand you didn't use
14   the taser, but you were there when it was
15   used, is that a discretionary call, in
16   other words, do you have to implement
17   physical methods to get Mr. Eldridge out of
18   the car before you can taser him or would
19   that violate the policy if you didn't?
20 A  No, it would not, not in this situation.
21 Q  So you could have, even though based on you
22   recollection, you didn't or Officer Moore
23   didn't.  He could have deployed the taser
24   after the verbal commands were not complied
25   with?

RALPH ELDRIDGE vs
CITY OF WARREN, ET AL

ROBERT HORLOCKER
June 9, 2011

Page 57

1 A   Yes.
2                MR. KYLE: That's all I
3        have.
4                MS. LEACH: No more
5        questions.
6                - - -
7             (DEPOSITION CONCLUDED)
8                - - -

Page 58

CERTIFICATE OF NOTARY PUBLIC

STATE OF MICHIGAN)
                 )
COUNTY OF OAKLAND)

     I, HARVEY A. KAHN, a Notary Public within and for the
County of Oakland, State of Michigan, do hereby certify
that the witness whose attached deposition was taken
before me in the entitled cause, was sworn to testify the
truth, the whole truth, and nothing but the truth; that
the testimony contained in said deposition was taken by me
by means of recording; that said testimony was thereafter
reduced to written form and that the said deposition is a
true and correct transcript of the testimony given by said
witness.

     I do further certify that I am not connected by blood
or marriage to any of the parties, or their attorneys or
agents; that I am not an employee of any of them; nor am I
interested directly or indirectly in the matter in
controversy either as counsel, agent, attorney or
otherwise.

     IN WITNESS WHEREOF, I have hereunto set my hand at
Waterford, Michigan, County of Oakland, State of Michigan.

               HARVEY A. KAHN
               CER-5178
               Notary Public, Oakland County, Michigan
               My Commission Expires:  8/17/17

RALPH ELDRIDGE vs
CITY OF WARREN, ET AL

ROBERT HORLOCKER
June 9, 2011

**0**

**09 (1)**
26:3
**09-35770 (1)**
50:4

**1**

**1 (2)**
10:14;40:11
**12:55 (1)**
3:3
**13 (1)**
11:2
**18 (3)**
15:14;25:18;40:6
**18th (3)**
36:23;37:25;41:16
**1985 (1)**
5:6

**2**

**200 (1)**
52:2
**2006 (1)**
43:24
**2009 (5)**
15:14;25:18;36:23;
37:25;40:6
**2010 (3)**
26:5,10,12
**2011 (1)**
3:2
**240 (3)**
22:14;23:23;29:17

**5**

**511 (1)**
50:3
**5-11 (1)**
22:14

**6**

**6-18-09 (1)**
50:1

**8**

**85 (1)**
5:9

**9**

**9 (1)**
3:2
**9:30 (1)**
25:16
**96 (1)**

5:12
**98 (3)**
5:8,9;6:1

**A**

**able (5)**
14:17;21:6,7;29:19;
53:12
**academy (1)**
5:7
**according (1)**
55:21
**accurate (1)**
4:16
**across (3)**
28:2,14,20
**actually (3)**
16:24;39:18;41:24
**addition (1)**
11:22
**address (1)**
37:19;47:6
**adequate (3)**
36:24;37:5;39:8
**administered (1)**
41:4
**affect (1)**
7:10
**affected (1)**
43:7
**again (7)**
15:18;20:22;21:2,3;
47:3;50:20,22
**against (1)**
21:7
**agree (4)**
8:7;22:5;45:11;46:18
**agreement (1)**
3:13
**ahead (1)**
16:14
**aid (1)**
37:10
**alcohol (5)**
10:21;11:11;13:11,15;
38:22
**alert (1)**
38:1
**allowable (1)**
3:15
**allowed (1)**
56:8
**almost (1)**
39:10
**along (1)**
53:16
**always (6)**
14:16;16:25;36:16,16;
41:1,7
**Ambulance (4)**
34:3;35:21;41:3;43:2
**amount (1)**

19:12
**angle (1)**
28:11
**anticipating (1)**
16:5
**anymore (1)**
35:19
**apparently (1)**
7:2
**appear (1)**
11:18
**appeared (2)**
11:20;28:11
**appears (1)**
45:16
**approach (1)**
20:8
**appropriate (6)**
6:21;18:5,17,19;45:1;
48:14
**area (2)**
28:5;52:9
**argue (2)**
39:17,19
**arm (12)**
12:14,16;21:25;24:1,
10,11;28:6,7,22,23,24;
55:2
**arms (2)**
29:21,23
**around (3)**
28:10;32:5;43:16
**arrest (1)**
5:21
**arrests (1)**
11:5
**arrived (2)**
35:22;43:3
**assign (1)**
46:11
**assume (2)**
12:24;17:22
**assuming (3)**
20:2;24:4;48:8
**attached (1)**
42:18
**attempted (1)**
56:9
**attempting (1)**
12:22
**attempts (1)**
51:18
**attended (1)**
43:3
**attorney (1)**
55:9
**audio (9)**
39:4,5,8,18,19;45:13,
18;46:5;52:22
**autism (1)**
17:19
**aware (3)**
42:25;44:9;54:2

away (4)
20:25;24:20;31:14;
44:3

**B**

**back (25)**
14:24;21:19;22:6,22;
23:20;24:2,8,23;25:5,17;
28:3,14,21,22;29:1,2,6,
10,14,20,23;31:3;32:25;
40:22;52:9
**Backing (1)**
19:14
**bad (1)**
39:25
**badge (1)**
49:13
**balance (1)**
52:13
**based (2)**
19:11;56:21
**basically (2)**
27:1;45:7
**became (1)**
42:25
**behaviors (1)**
11:15
**behind (3)**
24:2;28:6,24
**belt (1)**
32:25
**besides (1)**
27:8
**best (1)**
33:12
**better (2)**
16:22;26:14
**big (1)**
22:13
**black (2)**
31:8;34:15
**blade (2)**
22:4;28:13
**blades (2)**
28:3,10
**blood (7)**
14:5;15:1,2;16:19;
17:12;34:5;47:10
**blue (1)**
31:10
**body (7)**
12:18;14:8;22:12;
24:11,22;27:19;28:15;
29:10;46:2;49:14
**both (4)**
19:3;28:25;29:14;30:2
**bounce (1)**
25:4
**bracelet (2)**
18:1;49:13
**brake (5)**
8:8,11,14;9:22;20:9

break (1)
52:20
**briefly (1)**
26:15
**bring (3)**
24:23;29:23;39:23
**broad (1)**
29:21
**brought (1)**
14:18
**bumper (1)**
34:15
**buttocks (4)**
28:5,17,21;52:9

**C**

**call (4)**
33:19;50:12;53:10;
56:15
**called (6)**
34:1,4,10;36:1;39:22;
41:4
**came (4)**
33:16;43:14;50:11,14
**can (13)**
4:12;6:8;11:13;12:18,
24;16:11;18:13;20:8,10;
24:15;31:2;47:22;56:18
**car (11)**
8:13,14;17:11;18:3;
34:14;35:13,25;46:17;
52:22;55:13;56:18
**care (1)**
14:17
**carries (1)**
44:8
**carry (1)**
44:7
**case (3)**
7:1;8:15;41:5
**cause (2)**
38:10;48:7
**CD (1)**
39:18
**certain (2)**
39:24;46:2
**chain (1)**
50:2
**chance (1)**
38:20
**charge (1)**
23:5
**checked (4)**
34:5;47:10,11;53:2
**checking (1)**
50:10
**chest (1)**
24:18
**choose (1)**
27:8
**circumstances (7)**
8:16;22:21;23:24;

(1) 09 - circumstances

RALPH ELDRIDGE vs
CITY OF WARREN, ET AL

ROBERT HORLOCKER
June 9, 2011

24:5;25:6;48:19;49:1
City (2)
48:25;54:1
Civil (1)
3:17
clear (1)
4:11
close (1)
38:18
Colegio (1)
50:18
C-o-l-e-g-i-o (1)
50:24
cologne (2)
10:22;38:24
coming (3)
9:22;30:21;38:22
command (2)
6:16,21
commands (2)
7:13;56:24
comment (1)
52:25
Commissioner (1)
50:1
communication (1)
49:25
communications (1)
4:8
complain (1)
30:14
completely (1)
45:15
complied (1)
56:24
comply (6)
6:20;7:6,19;18:3,6;
36:7
computer (1)
39:9
concern (1)
20:11
concerned (1)
9:21
CONCLUDED (1)
57:7
conclusion (1)
33:16
condition (9)
14:23;32:7;34:8,24;
35:7,14;36:3;38:2;48:20
confrontation (1)
55:17
connect (1)
30:5
connected (3)
22:3;30:12;31:9
connection (1)
41:15
considered (1)
35:2
consistent (6)
7:15;8:12,20;9:16;

44:1;48:13
construe (1)
12:18
consumption (1)
11:11
contact (1)
38:18
continuing (1)
55:2
control (9)
13:5;18:12;21:25;
24:10,19;29:9;46:18;
54:16,23
conversation (1)
47:25
convinced (1)
36:4
copies (1)
41:14
corporal (2)
26:19;27:5
correctly (1)
28:9
counsel (3)
3:13;16:4;53:3
country (1)
17:16
County (3)
5:2,11,14
couple (1)
5:2
course (2)
11:1;25:19
court (1)
4:6
covered (1)
37:12
covers (1)
37:3
CPR (1)
37:10
crackling (2)
19:10;21:3
CROSS (1)
51:4
cuffed (1)
52:7
cuffs (15)
30:2,5,6,6,7,15,23,25;
35:18,19,21,24;46:16;
48:6,9
currently (1)
4:19
custody (1)
44:15
cut (1)
45:15

D

danger (1)
54:16
darts (1)

19:7
date (1)
50:15
day (3)
27:3;46:8,13
dealing (3)
13:13,17;16:25
dealt (1)
37:1
decision (3)
7:11;48:5;56:7
defined (1)
45:4
demeanor (1)
38:20
Department (27)
4:22;5:12,14;6:9;11:4;
12:1;13:23;15:21;19:18;
26:20,21,22,25;27:10;
29:5;30:18;33:21;34:2;
43:16,23;44:14,24;
46:25;48:15;49:20,25;
54:2
dependent (1)
14:19
depending (1)
25:9
depends (7)
6:17,24;17:12;18:7;
19:23;23:9,10
depicts (1)
44:16
deployed (4)
19:6;54:13;55:21;
56:23
deployment (2)
18:25;20:16;50:4,12
deposed (1)
3:23
deposition (7)
3:11,22;25:4,13;
37:22;39:24;57:7
described (3)
37:21,22;52:8
detail (1)
27:2
detect (1)
38:21
Detention (2)
5:15,16
determination (1)
17:23
determine (4)
10:16,19;34:21;36:11
determined (7)
7:20;15:23;34:7,19;
44:11;47:11;48:16
Detroit (1)
3:1
device (6)
31:6,10;32:14,20;
33:9;39:1
diabetes (7)

14:9;17:8;26:16;
31:15,23;33:16;34:9
diabetic (11)
13:18;14:21;16:17,18;
18:18;32:10;36:20;
38:11;41:3;47:24;49:16
diabetics (1)
17:16
diagnosed (1)
14:24
different (6)
17:11;22:9,10,11;
38:3;50:11
differently (2)
37:24;38:9
DIRECT (3)
4:18;52:24;55:9
directives (1)
44:24
directly (1)
53:9
disable (1)
46:5
disabled (1)
8:24
disclosures (1)
42:19
discovered (1)
38:7
discovering (1)
39:1
discovery (1)
16:9
discretionary (3)
56:7,11,15
discussion (1)
47:21
dispatch (1)
34:1
distinguish (1)
12:3
distributed (1)
44:5
document (2)
40:7;49:24
documents (2)
39:24;40:4
done (2)
38:2,8
door (1)
12:15
DOUGHERTY (2)
43:18;50:19
down (4)
21:24;23:14;42:3,21
drive (2)
8:15;49:4
driver (1)
10:3
driver's (4)
19:15,20;20:3,7
driving (6)
9:25;10:17;23:9,10;

46:13,15
drugs (1)
13:12
drunk (3)
35:3;38:12,14
duces (1)
39:22
duly (1)
3:6
during (10)
25:4,19,23;26:14;
27:3;37:22;40:13,15;
46:6;55:25
duties (1)
27:5
duty (1)
27:9
DVD (1)
52:22
Dwyer (1)
50:1

E

early (2)
26:11,12
effect (5)
19:11,13;20:24;21:5;
54:6
effective (1)
55:3
effectuating (1)
5:21
either (5)
18:15;26:11;39:1;
40:3;42:16
ejection (1)
19:8
Eldridge (30)
7:25;11:16;12:9;
21:10,17;23:13;24:12;
27:16;28:10,13,16;
29:12;30:14;31:1;33:4;
34:6,10,23;36:2,6;40:6;
43:3;46:16;47:5,22;
51:11,22;55:10,17;56:17
Eldridge's (9)
20:18;21:19;22:6,23;
24:8;25:5;27:24;28:17;
29:1
else (2)
33:22;48:8
Emergency (5)
27:14;36:14;47:1,4;
48:1
employed (1)
5:1
EMS (3)
34:4,10;36:1
encounter (1)
16:16
encountered (3)
15:23;20:4;43:1

(2) City - encountered

RALPH ELDRIDGE vs
CITY OF WARREN, ET AL

ROBERT HORLOCKER
June 9, 2011

engine (1)
  9:1
enter (1)
  7:6
entire (1)
  25:21
episode (11)
  15:5,16,20;17:5,25;
  36:15,20;37:2,7;38:5,6
equal (2)
  23:2,3
equation (1)
  7:7
escorted (2)
  34:13;35:12
even (3)
  42:7;43:15;56:21
Eventually (1)
  30:18
everybody (1)
  22:10
everybody's (1)
  22:9
Everyone (1)
  44:8
exactly (2)
  21:13;27:22
EXAMINATION (4)
  4:18;51:4;52:24;55:7
excepted (1)
  19:24
excessive (5)
  5:20;22:20;24:6;25:2,
  7
Excuse (2)
  32:14;38:25
Exhibit (2)
  10:14;40:11
experience (9)
  5:19;13:13,17;14:4;
  15:12,13;36:18,24;37:3
experiences (2)
  11:9;46:1
explained (1)
  36:6
explanation (1)
  49:7
exposed (1)
  31:10
exposes (1)
  54:14
extra (1)
  30:5
extract (1)
  12:22
eyes (1)
  38:21

**F**

face (1)
  23:14
fact (3)

  7:4,9;29:21
failure (1)
  6:15
fair (6)
  5:22;6:12,16;7:7;
  11:14;39:12
fairly (1)
  36:3
faker (1)
  32:5
fall (1)
  31:6
familiar (1)
  54:19
far (3)
  8:19;29:23;37:13
fault (1)
  41:12
faulty (1)
  45:24
Federal (2)
  3:16,16
feel (3)
  39:25;46:22;52:3
feet (3)
  12:12,15,20
fell (1)
  32:16
felt (2)
  13:10;36:9
few (2)
  44:4;51:5
fight (1)
  22:16
fill (3)
  41:22,24;42:1
filled (3)
  10:12;42:7,11
final (1)
  53:24
finally (1)
  29:19
fine (1)
  7:2
finger (1)
  47:11
finished (1)
  26:8
fire (11)
  18:9,21;30:18;33:19,
  20,20;34:2;43:15;46:25;
  48:15;53:10
first (19)
  3:6;12:11;13:19;
  18:25;19:19;20:4,16,23;
  24:17;32:9,11,12;35:1;
  37:10;42:25;43:23;44:4;
  45:20;56:3
five (3)
  20:23;56:3,4
follow (2)
  6:11,15
follows (2)

  3:9;53:9
food (2)
  14:7,10
foot (7)
  8:8,11,14,22;9:22;
  20:9;28:18
force (8)
  5:20;18:20;22:11;
  24:6;25:3,8;48:21;56:9
formal (2)
  16:3;37:9
formation (1)
  42:22
forms (1)
  32:1
found (3)
  10:19;38:15;47:23
four (1)
  56:4
front (5)
  34:14;35:13,25;40:11;
  46:17
fucked (4)
  39:2;53:1,17,17
full (1)
  52:10
further (1)
  35:15

**G**

gain (3)
  18:12;21:25;24:18
gaining (1)
  13:5
gave (4)
  16:15;17:8;42:1;47:12
gear (3)
  8:10;9:6;20:10
gel (1)
  47:13
Generally (1)
  49:9
generated (3)
  40:5,7,10
gentleman (1)
  38:13
gets (1)
  14:5
given (3)
  6:11;37:10;43:9
glucose (2)
  36:17;47:13
goes (2)
  18:8;37:13
good (2)
  39:6,21
grabbed (2)
  30:9,9
graduated (1)
  5:5
ground (18)
  10:20;12:13,15,20;

  21:8,9,14,18;22:7;23:14,
  18,25;27:17;29:7,14;
  34:11;38:8;52:15
guess (2)
  6:17;23:9
guy (1)
  32:4
guys (4)
  23:7;41:5;46:18;55:11

**H**

hand (10)
  12:16;22:18;24:13,15,
  19,20,25;29:20;32:17;
  47:10
handcuff (5)
  12:13;19:3;20:18;
  24:1;27:17
handcuffed (4)
  33:3,6;34:17,19
handcuffs (8)
  29:22,25;30:13;46:24;
  47:15;48:3,11,14
handed (1)
  41:20
handle (1)
  37:23
hands (3)
  19:3;40:21;47:14
happen (4)
  21:21,22,23;45:21
happened (14)
  19:2;20:16,20;21:4;
  26:3;33:25;34:4,6;
  35:11;45:20;47:16;
  49:22,23;50:8
happening (1)
  56:5
happens (2)
  29:18;30:25
head (5)
  4:8;23:16;27:24;
  31:13;35:9
headaches (1)
  14:12
health (1)
  18:9
hear (5)
  19:7,9;21:1,2;30:16
heard (8)
  6:2;11:23;19:16;
  20:21;31:22,25;36:16;
  39:5
height (1)
  51:23
held (1)
  4:24
high (4)
  5:5;14:25;22:8;39:10
himself (1)
  49:4
hired (1)

  5:8
holding (7)
  12:17;24:22;28:7,23;
  32:15,17,19
hooked (2)
  31:23,25
Horlocker (5)
  3:12,18;51:5;52:20;
  55:8
house (1)
  17:10
Hundreds (1)
  11:7
hurt (1)
  49:4
hypoglycemia (6)
  13:22,25;14:3,9,25;
  15:24
hypoglycemic (11)
  15:5,15,20;17:5,24;
  18:18;36:15,20;37:7;
  38:5,6
hypothetically (1)
  17:22

**I**

idea (7)
  12:24;24:14;36:22;
  37:16;44:22;48:6;51:25
identification (1)
  31:5
identified (1)
  15:13
identifiers (1)
  18:23
ill (1)
  7:12;12:5
illness (4)
  6:24,25;7:10;31:16
imagine (1)
  22:16
implement (1)
  56:16
imprint (1)
  31:3
inappropriate (3)
  44:11;45:3,6
incident (11)
  9:15;15:25;16:2,17,
  21;18:16;37:17;40:5;
  41:16;49:19;54:7
include (1)
  42:22
incoherency (1)
  14:16
incoherent (2)
  10:24;11:18
independent (1)
  39:13
indicate (1)
  49:17
indicated (2)

RALPH ELDRIDGE vs
CITY OF WARREN, ET AL

ROBERT HORLOCKER
June 9, 2011

10:8;11:17
**indicates (2)**
18:1,16
**indicating (3)**
7:2;37:18;44:24
**indication (1)**
38:1
**individual (30)**
6:10,19;7:1,5,18,20;
8:13,16;9:11;10:5,17;
12:4;13:8;15:19,24;
17:3,23;18:2,6;19:20;
29:6;37:6,15,19;41:2;
42:25;44:15;48:18,21;
49:2
**individuals (7)**
11:10,13;13:18,25;
15:14;26:24;36:18
**individual's (3)**
6:15;49:7;50:17
**ineffective (4)**
46:4;54:17,18,24
**inflicting (1)**
45:9
**influence (5)**
10:6,18;11:21;13:10,
14
**information (3)**
42:3,24;49:9
**initial (1)**
42:18
**initially (2)**
25:1;33:10
**inject (1)**
31:23
**injury (1)**
22:8
**inquire (2)**
48:18;49:5
**inquiry (1)**
49:2
**instance (1)**
8:19
**Instead (1)**
30:8
**instruction (2)**
41:8;47:18
**instructor (1)**
26:13
**insulin (3)**
14:6,19;31:24
**inter- (1)**
49:24
**interdepartmental (1)**
12:1
**interpret (1)**
4:7
**interviewed (1)**
49:18
**into (2)**
7:6;28:12
**intoxicated (5)**
11:10,19;12:4;13:3,9

**investigation (1)**
5:21
**involve (1)**
44:22
**issue (1)**
6:3
**issued (1)**
43:23

**J**

**jail (1)**
5:17
**January (3)**
5:8;26:4,5
**Javery (2)**
50:3,8
**joke (1)**
41:13
**juice (2)**
36:17;37:8
**June (9)**
3:2;15:14;25:18,18;
26:3;36:23;37:25;40:6;
41:16
**junior (1)**
14:25

**K**

**keep (1)**
29:10
**keys (7)**
8:1,4,24;9:9,13,14;
49:3
**kicks (1)**
14:10
**kind (6)**
11:17;12:13;16:22;
19:18;27:19;28:1
**knee (15)**
21:19;22:3,5,22;24:7;
25:5;28:2,9,18,20;29:2,
6,11;52:8,14
**kneecap (1)**
28:12
**knees (1)**
28:25
**knew (1)**
32:4
**knowing (1)**
7:12
**knowledge (3)**
13:24;36:19;44:12
**known (1)**
5:25
**K-o-h (1)**
43:18
**Kohlruss (3)**
41:21;42:2;43:12
**K-o-h-l-r-u-s-s (2)**
43:14,20
**KYLE (20)**

3:10,19,21,25;4:3,6,
10,14,18;16:4,7,13;
42:13,16,23;43:21;
50:21,25;55:7;57:2

**L**

**lack (2)**
16:22;26:13
**language (1)**
54:20
**lasted (1)**
56:3
**later (1)**
44:10
**laughing (1)**
44:17
**lawsuit (1)**
16:22
**lawyers (1)**
40:1
**lawyer's (1)**
41:12
**LEACH (9)**
16:10;42:13,17;51:2,
4;52:16,19;55:5;57:4
**lead (1)**
7:13
**learned (1)**
7:20
**least (4)**
6:1;21:6;51:23,24
**leather (1)**
31:8
**leave (1)**
46:23
**left (12)**
12:14;19:4;20:18;
23:8;24:1;27:18;28:1,7,
15,23;30:7;41:6
**leg (5)**
28:1,2,5;52:12,14
**legs (1)**
27:25
**lesser (1)**
54:16,23
**level (4)**
16:19;17:12;34:5;
47:12
**license (5)**
19:15,20;20:4,7,14
**light (1)**
37:24
**likely (2)**
34:7;54:17
**limit (2)**
15:13;45:7
**limited (1)**
26:25
**lines (1)**
53:16
**listen (2)**
52:21,21

**little (1)**
31:10
**located (2)**
34:12;46:2
**location (1)**
34:3
**long (3)**
4:24;5:25;10:16
**looked (4)**
31:14;33:10,14;40:8
**looking (5)**
21:24;31:4;42:10,14;
49:12
**loosen (2)**
30:17;35:17
**loosened (1)**
35:20
**low (3)**
14:5;15:1,2
**lower (1)**
52:9

**M**

**main (3)**
20:11;27:5,9
**make-up (1)**
22:12
**many (1)**
25:20
**Mark (2)**
50:2,8
**matter (2)**
6:14;17:10
**may (5)**
16:15;22:9;26:5;41:1;
54:12
**maybe (5)**
22:14;31:15;45:12,12;
48:11
**mean (9)**
7:9;17:12;22:9;29:8;
38:17;44:4;45:24;48:17;
49:11
**means (4)**
45:8;54:16,23;55:22
**measure (2)**
16:5,11
**medical (17)**
32:6;33:17;34:8,24;
35:7,14;36:5,10;47:1,4,
19;48:1,16,20;49:6,15,
17
**medication (1)**
15:3
**memorandums (1)**
44:23
**memorize (1)**
54:9
**memory (2)**
39:14,15
**mentioned (1)**
37:11

**met (1)**
3:19
**method (3)**
18:5;17;29:8
**methods (1)**
56:17
**Michigan (1)**
3:1
**microphone (2)**
46:7,12
**middle (1)**
38:5
**might (22)**
13:2;16:16,18;17:9,
17,19;25:9,10;28:4;
33:14;35:2,6,6;37:11;
38:2;42:20;47:9,23,24;
49:21;50:7;56:4
**millions (1)**
17:15
**mind (2)**
53:19,20
**minute (2)**
19:14;26:7
**month (1)**
44:6
**Moore (25)**
8:7;9:12;11:23;19:5;
21:18;22:13,22;23:20;
24:7;25:3;27:22,23;
28:9;30:10;33:10,12;
34:1,9;39:2,5;46:14,15;
53:9;55:12;56:22
**Moore's (5)**
6:2,7;28:1,12,15
**more (3)**
34:7;55:5;57:4
**morning (1)**
3:19
**Most (2)**
19:22,25
**mouth (3)**
6:6,7;40:25
**moving (2)**
20:12;29:10
**Mrs (1)**
41:19
**much (5)**
23:22;29:16;41:6;
44:5;51:25
**muffled (1)**
39:11
**muted (1)**
45:17
**myself (1)**
52:13
**myth (1)**
36:16

**N**

**name (4)**
43:11;50:17,20,22

Min-U-Script®

RALPH ELDRIDGE vs
CITY OF WARREN, ET AL

ROBERT HORLOCKER
June 9, 2011

near (1)
28:17
necessarily (1)
18:10
necessary (1)
36:10
necessity (1)
49:17
neck (5)
21:19;22:6,23;24:8;
25:6
necklace (2)
17:25;49:13
need (3)
14:6,6;33:20
needed (2)
31:24;52:12
needles (1)
49:15
needs (2)
37:7;41:3
news (1)
44:13
next (4)
21:4;29:18;33:25;
52:15
Nobody (1)
39:3
nod (1)
4:7
non-compliance (3)
49:8;51:7,13
normal (1)
11:20
Notary (1)
3:6
notes (2)
40:13,19
nothing's (1)
56:5
Notice (1)
3:13
number (4)
17:15;20:12;42:5;50:3
numbers (3)
17:15,20,20
numerous (2)
11:5,9

**O**

objection (2)
16:6,10
observe (1)
38:20
obviously (3)
20:9;43:7;56:3
occur (2)
12:11;20:13
occurs (1)
12:25
odor (2)
10:22;38:21

off (12)
8:25;9:22,25;30:19;
45:16;46:3,9;48:6,7;
49:4;52:16,18
offer (1)
49:9
offered (1)
54:14
Officer (49)
3:12,18;4:20;5:15,16,
19,20;6:2,7;7:19;8:7;
9:12;11:23;16:14;19:5;
21:18;22:13,22;23:1,20;
24:7;25:3;26:18;27:22,
23,25;28:9,11,14;30:10;
33:10,12;34:1,9;39:2,5;
41:21;42:2;44:10;45:3;
46:13,15;51:5;52:20;
53:9;54:14;55:8,12;
56:22
officers (3)
44:7,17;45:8
officer's (2)
6:15,21
officially (2)
6:1;49:21
once (8)
14:4;15:22;34:7;36:1;
38:4;46:16;49:2,10
one (26)
20:3,12;23:5,7,8,16;
24:10;27:18;28:20;30:9;
31:19;37:1,18;41:11;
42:7,9,11;44:3,8;45:13,
22;46:11;52:8;53:24;
54:6;56:3
only (6)
12:24;24:10;39:10;
40:10;46:11;51:12
operating (1)
10:5
opinion (2)
13:7;22:21
opportunity (1)
39:7
opposed (1)
35:3
orange (2)
36:17;37:8
order (1)
6:11
ordered (1)
36:8
orders (1)
18:6
Originally (1)
10:2
otherwise (1)
38:23
out (28)
7:3,4;9:9;10:12;12:14;
17:17,18;18:3,18;19:8;
20:14;28:1;31:4,6;

32:16;36:7,8;38:22;
41:22,24;42:1,7,11;47:2;
53:12,14;55:13;56:17
outside (1)
49:14
over (6)
23:21;28:4,5;29:11;
34:14;52:2
overlap (1)
12:7
own (2)
39:14,15

**P**

packet (1)
42:12
page (1)
54:12
pair (6)
29:22,25;30:5,8,9,10
paperwork (1)
50:10
par (1)
16:18
park (3)
9:2,8,18
part (3)
12:18;48:12;56:8
particular (2)
16:20;51:11
partner (4)
9:12;37:22;43:8;55:18
partner's (1)
3:22
Patrick (1)
22:13
patrol (2)
27:2;52:22
pause (1)
20:22
pavement (1)
23:15
people (5)
31:23;32:1;49:9,16;
52:5
perhaps (1)
10:6
period (1)
51:20
Perk (1)
27:6
person (3)
18:23;37:1;49:4
personal (3)
13:24;37:3;45:25
personally (1)
14:4
PERT (2)
27:4,7
P-E-R-T (1)
27:11
pertaining (1)

40:6
phone (1)
42:4
physical (4)
22:10;55:17,22;56:17
physically (3)
12:23;51:15;55:12
place (6)
3:14;21:18;22:22;
24:7;26:2;29:11
placing (1)
22:5
plaintiff's (1)
53:3
please (2)
50:22,23
PM (1)
3:3
pocket (3)
31:3;32:22,25
point (42)
12:8;13:2,4,7;14:6,9,
15;18:8;21:6,16;23:13;
24:2;27:16,22;28:19;
30:1;31:2,11;32:8,24;
33:2,3;34:13,17,25;35:1,
17,18;36:4,9;38:6,9,10,
15,16;46:5,21,24;52:23;
55:4;56:11,12
police (16)
4:19,20,22;5:7,18,19;
6:9;11:4;18:6;26:20;
27:14;43:23;44:10;
49:19,25;54:2
policies (1)
54:1
policy (16)
6:3,10,22;7:15,17;
8:12,20;9:16;17:21;
18:4;19:18;45:4;48:13;
56:8,10,19
pores (1)
38:22
position (3)
4:24;5:13;18:11
positive (1)
35:10
possibly (1)
17:24
pouch (2)
31:8,11
pouches (1)
49:15
pounds (2)
22:14;52:2
present (1)
39:20
pretty (4)
11:13;21:24;41:6;44:5
Prior (3)
5:1;15:14;16:2;43:8
probability (1)
22:8

probably (4)
32:10;33:16;51:24;
52:12
probes (1)
19:8
problem (1)
48:17
Procedure (3)
3:17;54:1,3
procedures (1)
51:8
prone (1)
37:15
proper (1)
16:19
provided (1)
53:2
Public (2)
3:7;54:15
pull (1)
12:9;31:4;32:19;55:2
pulled (3)
12:14;20:21;21:2
pulling (4)
12:21;20:25;24:20;
55:13
pump (13)
10:20;31:14,17;32:5;
33:17,23;34:13,21,23;
38:7;43:1;47:23;49:13
pumps (2)
31:22,25
punishment (1)
45:9
punitive (1)
45:6
purposes (2)
3:15;16:8
pursuant (1)
3:13
push (1)
34:15
put (6)
6:6;18:12;30:2,12;
32:25;40:24

**Q**

quarter (1)
25:16
quickly (1)
11:14

**R**

radio (1)
10:8
rank (1)
4:20
reacts (1)
22:10
read (1)
54:11

RALPH ELDRIDGE vs
CITY OF WARREN, ET AL

ROBERT HORLOCKER
June 9, 2011

real (1)
41:8
realize (1)
56:5
realized (1)
38:4
really (4)
7:10;37:7;39:13;40:25
reason (6)
6:14;10:8;32:6;46:23;
53:21;55:1
recall (29)
17:20;19:14,16;21:10,
11,13;26:11,17;29:12,
15;30:20;33:1,18,22;
35:5,16;38:25;41:23;
42:15;44:1;45:2;47:20,
22,24;48:4,10,12;50:17;
51:22
receive (1)
47:18
received (6)
12:2;13:20;18:14;
37:17,25;48:25
recognize (3)
11:13;15:19;31:17
recognizing (1)
13:21
recollection (6)
7:24;19:1;33:13;
53:15;55:10;56:22
record (3)
3:10;52:17,18
recorded (1)
25:17
recording (1)
45:17
REDIRECT (1)
55:7
referring (1)
50:14
reflect (1)
3:11
refused (2)
7:3,12
refusing (1)
24:23
regarding (2)
51:6;54:3
registration (1)
19:21
relation (2)
17:1,14
remained (1)
35:21
remedial (2)
16:5,11
remember (1)
51:8
remote (1)
46:12
remove (4)
48:2,14,21;51:15

removed (7)
8:1,24;9:13,14;35:23;
48:8,9
removing (2)
48:10;55:23
rephrase (2)
4:12;48:23
report (3)
10:11;41:23;44:14
reporter's (1)
4:7
request (1)
39:23
requested (1)
48:15
resistance (1)
54:13
resisting (1)
51:18
respect (4)
6:4;17:2;34:6;40:18
respecting (1)
40:20
respond (6)
15:7;17:2,13;33:12;
34:3;35:10
responded (1)
34:5
responds (1)
18:21
Response (4)
27:14;47:5,19;48:2
responsible (1)
18:9
restate (1)
7:8
restaurant (2)
5:4,10
result (2)
12:21;40:5
resulting (1)
22:8
review (3)
25:12;39:7;44:20
reviewed (1)
39:4;45:14
rid (1)
45:25
right (30)
3:23;5:10;10:1;11:5;
12:16;21:25;23:7,10,15;
24:17,25;27:19,20;28:2,
5,6,12,12,22,24;29:19;
30:7,12,19;31:14;38:15,
17;43:16;44:3;55:14
Robert (1)
3:12
Robin (1)
3:18
Rules (2)
3:16;4:1
run (1)
10:9

running (6)
8:9,11;9:1,3,19,20

## S

same (4)
21:3;31:5;43:16;55:25
sat (1)
3:21
saw (3)
23:12;31:12;32:3,14;
34:21,23;39:9
saying (11)
21:10,13;24:21;33:23;
38:11;39:1,2;53:6,8,13,
15
scene (4)
41:18;43:15;50:11,15
school (1)
5:5
scope (1)
6:17
scout (3)
34:14;35:13;46:17
season (1)
26:9
seat (1)
34:16
seated (2)
37:20;46:16
second (6)
29:22,25;52:17;54:11;
55:20,25
seconds (3)
20:23;56:4,5
Seeing (1)
38:1
sent (1)
10:2
sergeant (5)
49:21;50:2,7,11,18
serious (1)
41:13
session (3)
26:14;40:14,15
sets (1)
30:13
Sheriff (1)
5:2
Sheriff's (2)
5:12,14
shirt (4)
31:7,7;32:17,18
shock (1)
16:17
shook (1)
35:9
shoot (1)
19:8
short (1)
5:3
shoulder (5)
22:2,3;28:3,10,13

shoulders (1)
29:21
show (2)
16:24;40:1
showed (1)
26:15
showing (1)
19:13
shown (3)
39:21,25;40:3
sick (7)
6:19;7:5,18,21;34:20,
22;35:2
side (2)
23:16;24:18
sign (3)
42:6;49:10,11
signs (5)
12:6,6;16:15;17:8;
49:12
similar (2)
27:4;31:21
simply (1)
7:19
sitting (3)
7:25;8:13;35:25
situation (28)
6:18,23;7:14,22,24;
10:2;17:4;18:7,13,18;
19:19,23,24;20:2;23:12;
25:10,13;26:16;36:5,14;
37:23;41:3,9;46:19;
51:11;53:20;54:22;
56:20
situations (2)
7:23;54:13
situation's (1)
17:11
six-two (1)
51:24
slurred (1)
10:23
small (1)
28:21
smell (1)
10:21
smelled (1)
38:24
somebody (6)
16:16;17:9;26:15,21;
42:3;49:5
Someone (5)
26:20;45:16;46:9;
48:1,8
sometime (2)
26:5,9
sometimes (1)
20:13
somewhere (1)
41:22
sorry (2)
20:1;26:7
sort (3)

shoulders (1)
4:8;14:7;15:8
sound (3)
19:9,10;45:15
source (1)
12:5
speak (4)
7:22;22:11,24;42:4
specific (1)
29:4
specifically (2)
34:9;35:8
speckles (1)
14:12
speculate (1)
24:9
speech (1)
10:23
spell (3)
43:11;50:20,22
spoke (4)
26:15;41:19,25;43:5
spoken (1)
42:21
staggered (1)
19:10
stamp (1)
53:2
stand (3)
27:13;30:1;31:2
standing (2)
20:24;34:12
started (1)
26:8
starting (1)
5:12
starts (1)
26:4
statement (12)
5:23;6:12,16;7:7;
11:14;39:12;41:20,24;
42:6,15;43:4,4,9
statements (2)
41:15,18
station (1)
50:9
statistics (2)
17:17,18
Statutes (1)
3:16
steering (1)
12:17
still (19)
8:4;12:17,19;13:2;
18:5,8,11,17;19:13;
20:24,25;21:5;28:23;
33:3,6;34:10,17;35:24;
47:15
stomach (1)
23:18;29:9
stop (1)
20:11
street (1)
44:8

Min-U-Script®

RALPH ELDRIDGE vs
CITY OF WARREN, ET AL

ROBERT HORLOCKER
June 9, 2011

**strike (7)**
8:23;10:3;24:4;25:11;
36:12;47:6,14
**strong (3)**
10:22;22:15;52:3
**struggle (1)**
56:1
**struggled (2)**
47:2;52:5
**struggling (3)**
19:12,12;20:25
**stuff (1)**
14:12
**subject (4)**
16:21;50:3;54:14,15
**subsequent (4)**
16:5,11;18:15;37:25
**suffer (1)**
14:11
**suffering (8)**
15:15,20;16:17;17:24;
18:24;36:19;37:6;41:2
**sugar (8)**
14:5,7;15:1,2;16:19;
17:12;37:8;41:4
**suggested (1)**
25:4
**suggestions (1)**
16:1
**superior (1)**
23:1
**supervisor (1)**
50:13
**suppose (1)**
25:9
**supposed (1)**
4:7
**sure (7)**
15:6;18:22;21:11,23,
24;39:22;42:14
**suspect (1)**
6:10
**suspected (1)**
10:3
**suspects (1)**
13:14
**SWAT (1)**
27:7
**switch (2)**
45:17;46:3
**sworn (1)**
3:6
**symptoms (1)**
13:21
**system (3)**
14:11;45:24;46:4

**T**

**talked (3)**
11:17;33:15;36:2
**talking (3)**
20:15;25:7;26:8

**tall (1)**
51:22
**tape (1)**
39:5
**taser (31)**
6:9,23;7:11,13,18;
8:12,15;18:4,16,19;19:1,
5;20:17;44:9,14,21,25;
45:4,7;50:3,12;51:7;
53:25;54:4,12;55:20;
56:9,13,14,18,23
**tasered (12)**
8:2,5,22;9:4,11,12,24;
23:25;44:16;51:12;
55:11,16
**tasering (5)**
8:18;12:11,25;40:18,
20
**tasers (2)**
6:4;43:24
**team (7)**
27:4,6,7,15;47:5,19;
48:2
**technique (1)**
29:4
**tecum (1)**
39:22
**tells (1)**
18:22
**ten (1)**
25:16
**term (2)**
16:23;26:14
**testified (1)**
3:8
**testify (1)**
11:24
**testimony (5)**
6:3;27:18;43:22;55:9,
21
**therefore (1)**
6:20
**thinking (1)**
24:9
**Thirteen-and-a-half (1)**
4:25
**though (2)**
38:14;56:21
**thought (6)**
13:2;19:16;31:15;
32:9,11,12
**threat (1)**
46:21
**threw (1)**
17:18;45:16
**thrown (2)**
17:17,19
**Thursday (1)**
3:2
**tight (1)**
30:15
**times (4)**
19:22,25;25:20;45:15

**title (1)**
5:13
**today (1)**
25:13,25;40:8
**together (1)**
30:13
**toggle (1)**
46:1
**told (3)**
19:5;34:15;49:22
**took (2)**
30:19;52:20
**tool (1)**
45:6
**total (2)**
25:20;30:8
**touch (1)**
35:19
**towards (1)**
28:14
**trained (4)**
29:4;40:20;48:18;49:5
**training (31)**
5:18;11:22,23,25;
12:2;13:20;15:18,22;
16:23;17:1,14;18:14;
25:19,23;26:2,4,14,21,
22,24;27:10;36:24;37:4,
5,13,18,24;40:13,15,22;
48:24
**Tramble (1)**
41:19
**transcript (1)**
3:14
**treat (1)**
18:10
**treated (1)**
18:13
**treating (2)**
36:14,15
**treatment (1)**
32:1
**tried (1)**
52:21
**trigger (2)**
20:21;21:1
**truck (7)**
7:3,4;8:15;12:19;21:7;
36:8,8
**true (1)**
38:23
**truth (3)**
3:7,7,8
**truthful (1)**
4:16
**trying (11)**
6:6;12:9;21:25;24:18;
28:6,22,23;29:9;40:24;
51:15;52:7
**tube (1)**
47:13
**tucked (4)**
24:17;31:7;32:22,24

**turn (2)**
23:7;46:2
**turned (2)**
8:25;23:16;46:9
**turns (2)**
46:3;47:2
**two (5)**
5:3;25:22;30:6,8,13
**two-man (1)**
46:11
**type (8)**
14:10;15:15;31:15;
32:6;33:17;36:17;49:10,
14
**typical (1)**
16:15

**U**

**unable (4)**
6:20;7:6,18;45:13
**unconstitutional (1)**
5:22
**under (22)**
3:15;6:9,21;7:17;8:16;
10:6,17;11:20;13:10,14;
22:21;23:24;24:5,11,17,
22;25:6;27:19;31:7;
32:16;48:19;49:1
**understood (2)**
14:16;25:11
**unfold (1)**
23:12
**Universal (1)**
34:2
**unless (1)**
32:4
**unnecessary (1)**
54:15
**unsuccessful (2)**
55:13,23
**up (13)**
14:18;16:18,18;19:14;
20:10;21:6;22:1;30:1,
17;31:2,23,25;34:12
**upon (2)**
25:5;37:20
**upper (2)**
28:3,20
**use (19)**
5:20;6:4,8,23;7:11;
18:20;24:6;25:8;29:5;
44:9,14,20,25;45:4,7,8;
51:7;54:4;56:13
**used (6)**
3:15;16:20,24;29:22;
48:21;56:15
**using (3)**
28:25;30:9;40:22
**usually (1)**
20:6

**V**

**vehicle (31)**
8:1,2,5,8,9,10,23,25;
9:1,3,6,9,13,14,18,21,24;
10:6;12:10,22;17:3;
18:19;20:8,10,11;24:25;
37:20;46:12;48:22;
51:16;55:24
**verbal (5)**
4:4;7:13;51:7,12;
56:24
**verbally (1)**
41:25
**verify (1)**
46:25
**versus (1)**
12:5
**vest (1)**
46:3
**video (14)**
16:20,23;17:2;25:12,
21;26:15;39:7;40:23,25;
44:16;45:14,23;47:9;
53:6
**violate (1)**
56:19
**violence (1)**
37:15
**violent (2)**
36:21;38:12
**vision (1)**
14:12
**volume (1)**
39:9

**W**

**wait (1)**
26:7
**walking (1)**
32:5
**wallet (1)**
31:3
**Warren (16)**
4:22;6:9,22;7:15,17;
8:12,20;11:4;18:4;
26:20;43:23;44:10;
48:25;49:19,25;54:2
**watching (1)**
45:23
**way (12)**
6:8;14:24;17:6;22:1;
27:25;28:1,14;35:10;
37:18;45:13,22;46:3
**Wayne (3)**
5:2,11,14
**ways (1)**
22:11
**wearing (1)**
46:7
**weeks (1)**

A & M COURT REPORTING
248.681.1867

(7) strike - weeks

| | |
|---|---|
| 44:4 | 42:2,21 |
| **weigh (2)** | |
| 23:22;29:16 | **Y** |
| **weighed (2)** | |
| 51:25;52:1 | **year (4)** |
| **weight (2)** | 5:5;26:11,12;37:10 |
| 52:10,11 | **years (4)** |
| **weren't (2)** | 4:25;5:3,3;11:2 |
| 15:6;16:2 | **yelling (1)** |
| **what's (3)** | 29:12 |
| 14:16;19:1;39:22 | |
| **wheel (1)** | |
| 12:17 | |
| **where's (1)** | |
| 20:14 | |
| **whole (1)** | |
| 3:7 | |
| **whomever (1)** | |
| 50:14 | |
| **who's (6)** | |
| 8:13;17:3;23:9,10; | |
| 29:6;37:20 | |
| **whose (1)** | |
| 48:5 | |
| **William (1)** | |
| 50:1 | |
| **winter (1)** | |
| 26:9 | |
| **wire (1)** | |
| 31:9 | |
| **wires (1)** | |
| 32:18 | |
| **within (3)** | |
| 31:10;44:4,6 | |
| **without (1)** | |
| 18:22 | |
| **WITNESS (11)** | |
| 3:20,24;4:2,5,9,13,17; | |
| 40:1;42:20,22;43:19 | |
| **word-for-word (1)** | |
| 54:9 | |
| **words (3)** | |
| 6:6;40:24;56:16 | |
| **work (2)** | |
| 5:4,10 | |
| **worked (1)** | |
| 5:17 | |
| **worried (2)** | |
| 13:4,5 | |
| **wrestle (2)** | |
| 22:18;28:24 | |
| **wrestled (1)** | |
| 21:8 | |
| **wrist (8)** | |
| 12:14;19:4;20:18; | |
| 24:1,2;27:18,19;30:12 | |
| **wrists (1)** | |
| 30:2 | |
| **written (3)** | |
| 41:17;42:15;54:3 | |
| **wrong (2)** | |
| 32:4;40:24 | |
| **wrote (2)** | |